**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | |
|---|---|
| **IN RE AUTOMOTIVE PARTS ANTITRUST LITIGATION** | **CASE NO. 12-MD-02311**<br><br>**HON. MARIANNE O. BATTANI** |
| **In Re: AIR CONDITIONING SYSTEMS** | |
| **THIS RELATES TO: DIRECT PURCHASER ACTIONS** | **2:13-cv-02701-MOB-MKM** |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs Tiffin Motor Homes, Inc., and SLTNTRST LLC, Trustee for Fleetwood Liquidating Trust, individually and on behalf of the proposed class of direct purchasers of Air Conditioning Systems (as defined below), bring this action against Defendants for damages under the antitrust laws of the United States.

## SUMMARY OF THE CASE

1.      Defendants are manufacturers of automotive air conditioning systems ("ACSs" or "Air Conditioning Systems"), including compressors, for installation in motor vehicles manufactured or sold in the United States. Plaintiffs allege that Defendants conspired to rig bids, and to fix, maintain, and/or stabilize the prices of ACSs sold in the United States from at least as early as January 1, 2001 through the present. Plaintiffs further allege that Defendants fraudulently concealed their conspiracy.

2.      On September 26, 2013, the United States Department of Justice ("DOJ") announced that Valeo Japan Co., Ltd. agreed to plead guilty and pay a $13.6 million criminal fine for its role in a conspiracy to fix prices of ACSs installed in automobiles sold in the United States and elsewhere.

3.      On September 26, 2013, the DOJ announced that Mitsubishi Heavy Industries, Ltd. agreed to plead guilty and pay a $14.5 million criminal fine for its role in a conspiracy to fix prices of condensers and compressors installed in automobiles sold in the United States and elsewhere.

4.      Plaintiffs bring this lawsuit as a class action on behalf of direct purchasers who, during the Class Period, purchased ACSs in the United States from one or more of the Defendants or their co-conspirators.  This action is brought under Section 1 of the Sherman Act to enjoin Defendants' anticompetitive conduct and recover damages suffered by the Class.

5.      As a result of Defendants' unlawful conduct, Plaintiffs and members of the proposed Class paid higher prices for ACSs than they would have paid in a competitive market.

## JURISDICTION AND VENUE

6.      Plaintiffs bring this action to recover damages, including treble damages, and costs of suit and reasonable attorneys' fees, resulting from Defendants' violation of the Sherman Act, 15 U.S.C. § 1.

7.      The Court has jurisdiction over the subject matter of this action pursuant to Sections 4(a) and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.  Venue is proper in this district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c) and (d) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, affected interstate trade and commerce (discussed below) has been carried out in this District, and because one or more of the Defendants reside in this District.

8.      By virtue of their nationwide contacts and activities, Defendants are subject to the jurisdiction of this Court.   Alternatively, there is jurisdiction over the foreign Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2).

## DEFINITIONS

9.      The term "Class Period" refers to the time period from at least as early as January 1, 2001 through the present.

10.      The terms "ACSs" or "Air Conditioning Systems" refers to systems that cool the interior environment of a vehicle and are part of the thermal segment of the automotive market. Air Conditioning Systems, whether sold together or separately, are defined to include one or more of the following: automotive compressors, condensers, control panels, HVAC units (typically consisting of a blower motor, actuators, flaps, evaporator, heater core, and filter embedded in a plastic housing), sensors and associated hoses and pipes.

11.      The term "Defendant" or "Defendants" refers to the named Defendants and all of the named Defendants' predecessors, including ACS manufacturers merged with or acquired by the named Defendants, successors, and each named Defendants' wholly-owned or controlled subsidiaries or affiliates that sold ACSs directly to purchasers in the United States or to purchasers for use in the United States during the Class Period.

12.      References made herein to any corporation include any predecessors, successors, parents, subsidiaries, affiliates and divisions of that corporation.

## TRADE AND COMMERCE

13.      During the Class Period, each Defendant sold ACSs in the United States in a continuous and uninterrupted flow of interstate commerce.

14.     The business activities of the Defendants substantially affected interstate trade and commerce in the United States.

## PARTIES

15.     Plaintiff Tiffin Motor Homes, Inc., is an Alabama corporation with its principal place of business located in Red Bay, Alabama.  Tiffin Motor Homes, Inc. purchased ACSs directly from one or more Defendants and/or their co-conspirators during the Class Period and suffered injury as a result of Defendants' unlawful conduct.

16.     Plaintiff SLTNTRST LLC, is the duly authorized and empowered Trustee for Fleetwood Liquidating Trust. Fleetwood Liquidating Trust was formed pursuant to the Joint Plan of Liquidation of Fleetwood Enterprises, Inc. and Its Affiliated Debtor and the Official Committee Creditors Holding Unsecured Claims. The Joint Plan of Liquidation was confirmed by the United States Bankruptcy Court for the Central District of California (Riverside) pursuant to 11 U.S.C. § 1129. Fleetwood Enterprises, Inc. filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code on March 10, 2009. Fleetwood Enterprises, Inc., headquartered in California, was a leading producer of recreational vehicles, motor homes, and travel trailers in the United States. Fleetwood Enterprises, Inc. purchased ACSs directly from one or more Defendants and/or their co-conspirators during the Class Period and suffered injury as a result of Defendants' unlawful conduct.

17.     Defendant Valeo S.A. is a French société anonym with its principal place of business in Paris, France. Valeo S.A. – directly and/or through its subsidiaries, which it wholly controlled – manufactured, marketed and/or sold Air Conditioning Systems that were purchased throughout the United States, including in this District, during the Class Period. In its 2012 Registration Statement, Valeo S.A. explained that it "is an independent industrial group fully

- 4 -

focused on the design, manufacture and sale of components, integrated systems and modules for automobiles and trucks." Specifically, "[t]he Group defines the strategic direction and review and oversees the Business Groups. It defines the Group's standards and policies and ensures their implementation . . . . [and] ensures the consistency of sales and industrial policies." The Business Groups, in turn, "are responsible for business growth and operating performance of the Product Groups and Product Lines that they manage, across the globe."

18.     Defendant Valeo Japan Co., Ltd. is a Japanese corporation with its principal place of business in Saitama, Japan. It is a subsidiary of and wholly controlled by Valeo S.A. Valeo Japan Co., Ltd. – directly and/or through its affiliates, which it wholly controlled – manufactured, marketed and/or sold Air Conditioning Systems that were purchased throughout the United States, including in this District, during the Class Period.

19.     Defendant Valeo Inc. is a Delaware corporation with its principal place of business in Troy, Michigan.  It is a subsidiary of and wholly owned and/or controlled by Valeo S.A.  Valeo Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Air Conditioning Systems that were purchased throughout the United States, including in this District, during the Class Period.

20.     Defendant Valeo Electrical Systems, Inc. is a Delaware corporation with its principal place of business in Troy, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, Valeo Inc. Valeo Electrical Systems, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Air Conditioning Systems that were purchased throughout the United States, including in this District, during the Class Period.

21.     Defendant Valeo Climate Control Corp. is a Delaware corporation with its principal place of business in Bingham Farms, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, Valeo Electrical Systems, Inc. Valeo Climate Control Corp. manufactured, marketed and/or sold Air Conditioning Systems that were purchased throughout the United States, including in this District, during the Class Period.

22.     Defendants Valeo S.A, Valeo Japan Co., Ltd., Valeo Inc., Valeo Electrical Systems, Inc., and Valeo Climate Control Corp. are referred to collectively as "Valeo."

23.     Defendant Mitsubishi Heavy Industries, Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan. Defendant Mitsubishi Heavy Industries, Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Air Conditioning Systems that were purchased throughout the United States, including in this district, during the Class Period.

24.     Defendant Mitsubishi Heavy Industries America, Inc. is a Delaware corporation with its principal place of business in New York, New York. It is a subsidiary of and wholly owned and/or controlled by its parent, Mitsubishi Heavy Industries, Ltd. Defendant Mitsubishi Heavy Industries America, Inc. manufactured, marketed and/or sold Air Conditioning Systems that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales, and finances.

25.     Defendant Mitsubishi Heavy Industries Climate Control, Inc. is an Indiana corporation with its principal place of business in Franklin, Indiana. It is a subsidiary of and wholly owned and/or controlled by its parent, Mitsubishi Heavy Industries, Ltd. Defendant Mitsubishi Heavy Industries Climate Control, Inc. manufactured, marketed and/or sold Air

Conditioning Systems that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales, and finances.

26.    Defendants Mitsubishi Heavy Industries, Ltd., Mitsubishi Heavy Industries America, Inc., and Mitsubishi Heavy Industries Climate Control, Inc. are referred to collectively herein as "Mitsubishi."

27.    Defendant Denso Corporation is a Japanese corporation with its principal place of business in Kariya, Japan. Defendant Denso Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Air Conditioning Systems that were purchased throughout the United States, including in this District, during the Class Period.

28.    Defendant Denso International America, Inc. is a Delaware corporation with its principal place of business in Southfield, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, Denso Corporation. Denso International America, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Air Conditioning Systems that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales and finances.

29.    Defendants Denso Corporation and Denso International America, Inc. are referred to collectively herein as "Denso."

30.     Defendant Sanden Corp. is a Japanese corporation with its principal place of business in Tokyo, Japan.   Sanden Corp. - directly and/or through its subsidiaries, which it wholly owned and/or controlled - manufactured, marketed and/or sold ACSs that were purchased throughout the United States, including in this District, during the Class Period.

31.     Defendant Sanden International (U.S.A.), Inc. is a corporation with its principal place of business in Wylie, Texas.   It is/was a wholly-owned subsidiary of Sanden of America, Inc., which is/was a wholly-owned subsidiary of Sanden Corp.   Sanden International (U.S.A.), Inc. manufactured, marketed and/or sold ACSs that were purchased throughout the United States, including in this District, during the Class Period.

32.     Defendant Sanden Automotive Climate Systems Corp. is a Japanese corporation with its principal place of business in Tokyo, Japan.   It manufactures, markets or sells ACSs.

33.     Defendant Sanden Automotive Components Corp. is a Japanese corporation with its principal place of business in Tokyo, Japan.   It manufactures, markets or sells ACSs.

34.     Defendants Sanden Corp., Sanden International (U.S.A.), Inc., Sanden Automotive Climate Systems Corp. and Sanden Automotive Components Corp. are referred to collectively herein as "Sanden."

35.     Defendant Calsonic Kansei Corp. ("Calsonic") is a Japanese corporation with its principal place of business in Saitama, Japan.   Calsonic - directly and/or through its subsidiaries, which it wholly-owned and/or controlled - manufactured, marketed, and/or sold ACSs that were purchased throughout the United States, including this District, during the Class Period.

36.     Defendant Calsonic Kansei North America, Inc. ("Calsonic N.A.") corporation with its principal place of business in Shelbyville, Tennessee.   It is a wholly-owned subsidiary of

Calsonic.   Calsonic N.A. manufactured marketed, and/or sold ACSs that were purchased throughout the United States, including this District, during the Class Period.

37.     Defendants Calsonic and Calsonic N.A. are referred to collectively herein as "Calsonic."

38.     Defendant Panasonic Corp. is a Japanese corporation with its principal place of business in Osaka, Japan.   Panasonic Corp. – directly and/or through its subsidiaries, which it wholly-owned and/or controlled – manufactured, marketed and/or sold ACSs that were purchased throughout the United States, including in this District, during the Class Period.

## DEFENDANTS' CO-CONSPIRATORS AND AGENTS

39.     The acts alleged in this Complaint to have been done by Defendants Valeo Japan Co., Ltd., Valeo, Inc., Valeo Electrical Systems, Inc., Valeo Climate Control Corp., Mitsubishi Heavy Industries America, Inc., Mitsubishi Heavy Industries Climate Control, Inc., Defendant Denso America, Inc., Sanden International (U.S.A.), Inc., and Calsonic N.A. were authorized, ordered, and condoned by their respective parent companies and the acts alleged to have been done by each were authorized, ordered, and performed by Defendants Valeo S.A., Mitsubishi Heavy Industries, Ltd., Denso Corporation, Sanden Corp., Sanden Automotive Climate Systems Corp., Sanden Automotive Components Corp. and Calsonic, and their officers, directors, agents, employees, or representatives while engaged in the management, direction, control, or transaction of their business affairs.

40.     Various persons or firms not named as Defendants herein have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof.   The Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this Complaint.

- 9 -

41.     Each Defendant acted as the agent or joint venturer of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## CLASS ACTION ALLEGATIONS

42.     Plaintiffs bring this action on behalf of themselves and all others similarly situated (the "Class") pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3).  The Class is defined as follows:

> All individuals and entities who or that purchased ACSs in the United States directly from one or more Defendants (or their controlled subsidiaries, affiliates, or joint ventures) from at least as early as January 1, 2001 through the present.

43.     Plaintiffs do not know the exact number of Class members as such information is exclusively controlled by Defendants.  Because of the trade and commerce involved, however, Plaintiffs believe that the Class is so numerous and geographically dispersed throughout the United States that joinder of all Class members is impracticable.

44.     There are questions of law or fact common to the class, including but not limited to the following:

a.     Whether Defendants engaged in a contract, combination, or conspiracy to rig bids and to fix, raise, maintain, and/or stabilize prices of ACSs sold in the United States;

b.     Whether Defendants' conduct caused the prices of ACSs sold in the United States to be sold at artificially high levels;

c.     Whether Defendants undertook actions to conceal their unlawful conspiracy; and

d.     Whether Plaintiffs and other members of the Class were injured by Defendants' conduct, and, if so, the appropriate class-wide measure of damages for Class members.

45.     These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

46.     Plaintiff's claims are typical of the claims of the Class because Plaintiffs directly purchased ACSs from one or more of the Defendants, all Class members were damaged by the same conspiracy alleged herein, and the relief sought by Plaintiffs is common to the Class.

47.     Plaintiffs will fairly and adequately represent the interests of the Class in that Plaintiffs are direct purchasers of ACSs and have no conflict with any other members of the Class.  Further, Plaintiffs have retained competent counsel experienced in antitrust, class action, and other complex litigation.

48.     A class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.  Prosecution of this matter as a class action will eliminate the possibility of repetitive litigation and there are no inherent barriers to managing the case as a class action.

49.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying outcomes.

50.     The Class is also readily definable and is one for which records likely exist in the files of Defendants and their co-conspirators.

## FACTUAL ALLEGATIONS

### Air Conditioning Systems

51.     Air Conditioning Systems are systems that cool the interior environment of a vehicle and are part of an automobile's thermal system. Air Conditioning Systems, whether sold together or separately, include, among other things, one or more of the following: automotive compressors, condensers, control panels, HVAC units (typically consisting of a blower motor, actuators, flaps evaporator, heater core, and filter embedded in a plastic housing), sensors, and associated hoses and pipes.

52.     The global automotive thermal industry is a $36 billion dollar a year industry. According to a leading industry publication, the U.S. market for automobile HVAC is approximately $12.5 billion.

53.     A compressor circulates highly pressurized refrigerant gas throughout the vehicle air conditioning system.

54.     A condenser cools the refrigerant gas by condensing it into liquid.

55.     HVAC refers to heating, ventilation, and air conditioning.  Automotive HVAC units help maintain good indoor air quality and regulate the interior temperature of a vehicle.

56.     Defendants and their co-conspirators manufacture and sell several types of ACSs.

57.     The Global Automotive HVAC Systems Market 2012-2016 report for the industry research firm TechNavio notes that Defendants Denso and Valeo are two key vendors that dominate the Global Automotive HVAC Systems market. Defendant Denso is the largest North American producer of thermal systems, followed by Defendant Valeo (two other companies, Visteon Corp. and Delphi Automotive, have smaller market shares, controlling only about 25% of the market collectively). Based on its most recent annual report, Valeo earned approximately

half a billion USD in 2012 in thermal system revenues, which includes Air Conditioning Systems revenues, from North America in 2012. Defendants Mitsubishi, Sanden and Calsonic re also key players in the ACSs industry.

58. As part of the manufacturing process, original equipment manufacturers ("OEMs") install ACSs into new vehicles. They are also installed to replace worn out, defective or damaged parts.

59. ACSs manufactured, distributed, or sold by Defendants and their co-conspirators during the Class Period are not functionally distinguishable in any material way.

60. Plaintiffs and members of the proposed Class purchased ACSs directly from the Defendants.

**The Air Conditioning Systems Market is Conducive to Collusion**

61. In addition to the agreements to plead guilty, several important economic characteristics of the market for ACSs plausibly increased its conduciveness to a price-fixing conspiracy.

62. One such important, economic characteristic of a market conducive to conspiratorial behavior is high barriers to entry. There are substantial barriers to entry in the market for ACSs because of significant start-up capital expenditures. A new entrant into the business would have to incur millions of dollars in costs, including large investments in plant and machinery, research and development, infrastructure for distribution, transportation, and labor.

63. Additionally, the market for ACSs is highly concentrated. Upon information and belief, Defendants and their co-conspirators control a majority of the market for the manufacture and sale of ACSs for use in motor vehicles manufactured and/or sold in or into the United States.

64.     Inelastic pricing is another important characteristic.  When a seller of goods or services can increase prices without suffering substantial reduction in sales, pricing is considered inelastic.  In order for a cartel to profit from raising prices above competitive levels, pricing must be relativity inelastic.  Otherwise, increased prices would result in declining use of the product, revenues, and profits.

65.     Pricing for ACSs is highly inelastic.  Motor vehicle manufacturers must use ACSs because there are no viable substitute products.

### DEFENDANTS' ANTITRUST CONSPIRACY

66.     During the Class Period, Defendants and their co-conspirators, the dominant producers of ACSs, conspired to (a) rig bids for and allocate the supply of ACSs and (b) raise, fix, and maintain prices for ACSs sold in or into the United States.

67.     Defendants engaged in numerous acts in furtherance of the alleged conspiracy, as described below.

68.     Defendants participated in meetings, conversations, and communications to discuss bids and price quotations for ACSs sold in the United States.

69.     Defendants agreed during those meetings, conversations, and communications to rig bids and allocate the supply of ACSs sold in or into the United States.

70.     Defendants submitted bids and price quotations to motor vehicle manufacturers in accordance with their conspiratorial agreements.

71.     Defendants knew and intended that their pricing actions regarding their sales of ACSs to motor vehicle manufacturers would have a direct impact on prices for ACSs sold to all direct purchasers throughout the United States.

72.     Defendants engaged in a single price-fixing conspiracy involving ACSs that impacted not only multiple bids submitted to OEMs, but also the prices paid by all other direct purchasers of ACSs.  Defendants' scheme was implemented, it succeeded, and it affected the prices for all ACSs.

73.     Defendants accomplished their conspiracy, in part, by rigging bids they made in response to Requests for Quotation ("RFQs").  OEMs issue RFQs to motor vehicle parts suppliers to obtain prices for parts, including ACSs.

74.     OEMs use RFQs to procure parts for U.S.-manufactured motor vehicles in the United States and abroad.

75.     Typically, OEMs issue RFQs for motor vehicle parts, such as ACSs, approximately three years before the OEM begins vehicle production.

76.     The RFQ process is designed to obtain independent bids from multiple suppliers. The OEM RFQ process generally works as follows: (a) the OEM issues the RFQ to multiple parts suppliers, (b) the suppliers submit bids, (c) depending on the OEM and product, the OEM and suppliers may revise the technical specifications and the pricing, (d) the suppliers submit revised bids, and (e) the OEM selects the winner.

77.     Generally, RFQ contracts are awarded to suppliers that submit the lowest bids and last for the life of a vehicle model (approximately five years).

78.     When an OEM purchases, for example, ACSs directly from the supplier to whom it awarded the contract, the OEM purchases the ACS at the winning price.

79.     That winning price is also used when suppliers that were not part of the RFQ process purchase ACSs directly from the winning ACS bidder for incorporation into products

manufactured and sold to vehicle manufacturers. Those suppliers, who directly purchase ACSs from the winning bidder, pay the winning bidder at least the winning price.

80.     It was important to the success of the cartel alleged herein that its members control and manipulate the prices paid by OEMs in order to control the prices paid by all other direct purchasers of ACSs.

81.     Direct purchasers of ACSs in addition to OEMs also paid supracompetitive prices as a result of Defendants' conspiracy because the price-fixed bid of the winning bidder established the floor at which all ACSs were sold to direct purchasers.

**Collusion in the Automotive Parts Industries**

82.     Defendant Denso has a history of collusion, has been involved in antitrust investigations with respect to other automotive parts, and has been fined for its participation in anticompetitive cartels.

83.     For instance on January 30, 2012, the DOJ announced that Defendant Denso Corporation agreed to plead guilty (and pay a total of $78 million in criminal fines) to a two-count criminal information charging Denso Corporation with, among other things, participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of certain electronic control units and heater control panels sold to an automobile manufacturer in the United States and elsewhere from at least as early as January 2000 and continuing until at least February 2010 in violation of Section 1 of the Sherman Act. On March 5, 2012, Denso Corporation pleaded guilty to these charges.

84.     On March 26, 2012 a Denso Corporation executive agreed to plead guilty to participating in a criminal price-fixing and bid-rigging conspiracy involving the sale of heater control panels.

85.     On April 26, 2012, another Denso Corporation executive agreed to plead guilty to the same conspiracy.

86.     On May 21, 2013, two Denso Corporation executives agreed to plead guilty to conspiring to fix prices of heater control panels. One of the two executives further agreed to plead guilty to conspiring to fix the prices of electronic control units, which regulate power windows, power locks and other electrical systems. The executives agreed to serve time in U.S. prison and pay a criminal fine.

87.     A number of additional companies have pleaded guilty to fixing the prices of other automotive parts, including: automotive wire harnesses; instrument panel clusters; fuel senders; occupant safety restraint systems; automotive bearings; windshield wiper systems; windshield washer systems; power window motors; starters; starter motors; air flow meters; valve timing control devices; fuel injection systems; electronic throttle bodies; inverters; motor generators; radiators; alternators; ignition coils; anti-vibration rubber parts; automatic transmission fluid warmers; fan motors; switches; steering angle sensors; HID ballasts; and automotive lamps.   The U.S. government has said its automotive parts cartel criminal investigation will continue and that other suppliers could be charged.

88.     In a January 30, 2012 DOJ press release, Sharis A. Pozen, who was the Acting Assistant Attorney General of the DOJ's Antitrust Division, stated that the auto parts antitrust investigation is "the largest criminal investigation the Antitrust Division has ever pursued, both

in terms of its scope and the potential volume of commerce affected by the alleged illegal conduct."

89.     FBI Special Agent in Charge Andrew G. Arena also said that "[t]his criminal activity has a significant impact on automotive manufacturers in the United States, Canada, Japan and Europe and had been occurring at least a decade.  The conduct had also affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold."

90.     Thus far, dozens of companies and/or executives have been charged in the Antitrust Division's ongoing investigation into price fixing and bid rigging in the auto parts industry. Each of the twenty companies have either pleaded guilty or have agreed to plead guilty and have agreed to pay more than $1.6 billion in criminal fines.

**Defendants' Price Fixing Conspiracy: Government Investigation and Guilty Pleas**

91.     During the Class Period, Defendants and their co-conspirators conspired to rig bids for and allocate the supply of ACSs and raise, fix, and maintain prices for ACSs sold in or into the United States.

92.     On September 26, 2013, the DOJ charged Defendant Valeo Japan Co., Ltd. with participating in a "combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate the supply of, to rig bids for, and to fix, stabilize, and maintain the prices" of ACSs in violation of the Sherman Act.

93.     According to the Information filed, Defendant Valeo Japan Co., Ltd. and its co-conspirators carried out the Air Conditioning Systems conspiracy by:

(a) participating in meetings, conversations, and communications in the United

States and elsewhere to discuss the bids and price quotations to be submitted to

automobile manufacturers in the United States and elsewhere;

(b) agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(c) agreeing, during those meetings, conversations, and communications, to allocate the supply of Air Conditioning Systems sold to automobile manufactures, on a model-by-model basis, in the United States and elsewhere;

(d) agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

(e) submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

(f) selling Air Conditioning Systems to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices; and

(g) accepting payment for Air Conditioning Systems sold to automobile manufacturers in the United State and elsewhere at collusive and noncompetitive prices.

94.     Also on September 26, 2013, the DOJ announced that Defendant Valeo Japan had agreed to pay a $13.6 million criminal fine and plead guilty to a one-count criminal Information charging Valeo Japan with engaging in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of ACSs sold in the United States and elsewhere.  On November 5, 2013, Valeo Japan pleaded guilty to this charge.

95.    In a September 26, 2013 press release, Defendant Valeo "acknowledge[d] its participation in certain anticompetitive practices in the market for air conditioning systems and components" and "commit[ted] to continue its cooperation with the DoJ with respect to the DoJ's on-going investigation concerning the same market."

96.    On September 26, 2013, the DOJ charged Defendant Mitsubishi Heavy Industries, Ltd. with participating in a "combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the price" of compressors and condensers in violation of the Sherman Act.

97.    According to the Information filed, Defendant Mitsubishi Heavy Industries, Ltd. and its co-conspirators carried out the Air Conditioning Systems conspiracy by:

(a) participating in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(b) agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(c) agreeing, during those meetings, conversations, and communications, to allocate the supply of compressors and condensers sold to automobile manufacturers in the United States and elsewhere;

(d) agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

(e) submitting certain bids, price quotations, and price adjustments to automobile

manufacturers in the United States and elsewhere in accordance with the agreements reached;

(f) selling compressors and condensers to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g) accepting payment for compressors and condensers sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices; and

(h) engaging in meetings, conversations, and communications for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme.

98.     Also on September 26, 2013, the DOJ announced that Defendant Mitsubishi Heavy Industries had agreed to pay a $14.5 million criminal fine and plead guilty to a one-count criminal information charging Mitsubishi Heavy Industries with engaging in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of compressors and condensers sold in the United States and elsewhere.  On November 6, 2013, Mitsubishi Heavy Industries pleaded guilty to this charge.

99.     Eric Holder, U.S. Attorney General, stated in a September 26, 2013 DOJ press release that "[t]he Department of Justice will continue to crack down on cartel behavior that causes American consumers and businesses to pay higher prices for the products and services they rely upon in their everyday lives."

## PLAINTIFF'S CLAIMS ARE TIMELY

100.    Plaintiffs incorporate by reference the allegations set forth above and adopt same as though fully set forth herein.

101.    Plaintiffs and the members of the Class had no knowledge of the anticompetitive conduct alleged herein, or of facts sufficient to place them on notice of the claims set forth herein, until at least September 26, 2013, the date that the DOJ publically announced the guilty pleas of Defendants Valeo and Mitsubishi, at the earliest.  As a result, Plaintiffs and the members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until, at the earliest, September 26, 2013.

102.    No information in the public domain was available to Plaintiffs and the members of the Class prior to September 26, 2013, when the DOJ publically announced the guilty pleas of Defendants Valeo and Mitsubishi.  Prior to that time, there was insufficient information to suggest that any one of the Defendants was involved in a conspiracy to price-fix and rig bids for ACSs.  For these reasons, the statute of limitations as to claims alleged herein did not begin to run until, at the earliest, September 26, 2013.

103.    Further, fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Class until at least September 26, 2013.  Defendants affirmatively and wrongfully concealed their anticompetitive conduct from Plaintiffs and the Class, from at least as early as January 2001.  During that time, Plaintiffs and the Class did not learn or discover the operative facts giving rise to the instant Complaint.

104.    Before at least September 26, 2013, Plaintiffs and members of the Class were unaware of Defendants' unlawful conduct, and did not know before then that that they were

paying supra-competitive prices for ACSs throughout the United States during the Class Period. No information, actual or constructive, was ever made available to Plaintiffs and the members of the Class that would have suggested to Plaintiffs that they were being injured by Defendants' unlawful conduct.

96.     The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  For example, the DOJ press release states that "[i]n order to keep their illegal conduct secret, [Defendants] used code names and met in remote locations."

97.     By its very nature, Defendants' anticompetitive conspiracy was inherently self-concealing.  ACSs are not exempt from antitrust regulation and, thus, Plaintiffs and the members of the Class reasonably considered it to be a competitive industry.

98.     During the conspiratorial meetings, conversations, and communications, Defendants and their co-conspirators agreed upon bids and price quotations to be submitted to customers in the United States and elsewhere.

99.     Defendants likewise agreed to allocate the supply of ACSs sold to customers in the United States and elsewhere.

100.     Defendants also agreed to coordinate price adjustments requested by customers in the United States and elsewhere.

101.     In accordance with the agreements reached by Defendants, they submitted collusive bids, price quotations, and price adjustments to customers in the United States and elsewhere.

102.     Plaintiffs and the members of the Class could not have discovered the alleged combination or conspiracy at an earlier date by the exercise of reasonable diligence because of

the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their conduct.

103.    Plaintiffs received various pricing information from one or more of Defendants or their co-conspirators.  Plaintiffs had no way to know that these prices were higher than they should have been due to the conspiracy alleged herein.

104.    For these reasons, the statute of limitations applicable to Plaintiff's and the Class's claims was tolled and did not begin to run until at least September 26, 2013.

## ANTITRUST INJURY

105.    Defendants' conspiracy caused injury to Plaintiffs and members of the Class by suppressing price competition among ACSs manufacturers, thereby depriving all direct purchasers of ACSs of the benefits of a competitive market and setting prices of ACSs at artificially high levels.

106.    As a direct result of Defendants' conspiracy, Plaintiffs and members of the Class have been injured in their business or property in that they paid more for ACSs than they would have in a competitive market.

## CLAIM FOR RELIEF

### (Sherman Act Section 1 –Against All Defendants)

107.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

108.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, combination, or conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize prices for ACSs sold in or into the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

109.    The acts done by each of the Defendants as part of, and in furtherance of, the contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

110.    The contract, combination or conspiracy resulted in an agreement, understanding, or concerted action between and among the Defendants and their co-conspirators in furtherance of which the Defendants and their co-conspirators fixed, raised, maintained, or stabilized prices for ACSs sold in or into the United States.  Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws.

111.    Defendants succeeded in rigging bids and fixing, raising, maintaining, and stabilizing the prices of ACSs sold in or into the United States during the Class Period.

112.    The conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

113.    For purposes of formulating and effectuating their conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

a.    Participating in meetings and conversations in the United States and Japan to discuss the bids and price quotations of ACSs to be submitted to direct purchasers in the United States;

b.    Agreeing on bids and price quotations to be submitted to direct purchasers in the United States;

c.    Agreeing to manipulate prices and allocate supply of ACSs sold in or into the United States in a manner that deprived direct purchasers of free and open competition;

d.    Agreeing to coordinate price adjustments in the United States;

e.      Submitting bids, price quotations, and price adjustments to direct purchasers of ACSs in accordance with the agreements reached;

f.      Selling ACSs to direct purchasers in the United States at supracompetitive prices; and

g.      Employing measures to conceal the true nature of their unlawful conduct from Plaintiffs and other members of the Class in furtherance of the conspiracy.

114.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the other members of the Class have been injured in their businesses and property in that they have paid more for ACSs than they otherwise would have paid in a competitive market.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court enter judgment on its behalf and on behalf of the Class herein, and respectfully requests the following relief:

A.      That the Court determine that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, with Plaintiffs as the designated Class representative and their counsel as Class Counsel;

B.      That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this complaint, be adjudicated and decreed a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. §1;

C.      That Plaintiffs and members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against the Defendants in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. §15(a);

D.      That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

E.      That Plaintiffs and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

F.      That Plaintiffs and members of the Class be awarded pre-judgment and post-judgment interest in accordance with law; and

G.      That Plaintiffs and members of the Class receive such other or further relief as may be just and proper.

## **JURY TRIAL DEMANDED**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.


Dated:  January 12, 2016                    Respectfully submitted,


                                            */s/ David H. Fink*
                                            David H. Fink (P28235)
                                            Darryl Bressack (P67820)
                                            **FINK + ASSOCIATES LAW**
                                            38500 Woodward Ave.; Suite 350
                                            Bloomfield Hills, MI 48304
                                            Telephone: (248) 971-2500
                                            dfink@finkandassociateslaw.com
                                            dbressack@finkandassociateslaw.com

Eugene A. Spector
William G. Caldes
Jonathan M. Jagher
Jeffrey L. Spector
**SPECTOR ROSEMAN KODROFF**
**& WILLIS, P.C.**
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone:(215) 496-0300
espector@srkw-law.com
bcaldes@srkw-law.com
jjagher@srkw-law.com
jspector@srkw-law.com

Steven A. Kanner
William H. London
Michael E. Moskovitz
**FREED KANNER LONDON & MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4510
skanner@fklmlaw.com
wlondon@fklmlaw.com
mmoskovitz@fklmlaw.com

Joseph C. Kohn
William E. Hoese
Douglas A. Abrahams
**KOHN, SWIFT & GRAF, P.C.**
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
jkohn@kohnswift.com
whose@kohnswift.com
dabrahams@kohnswift.com

Gregory P. Hansel
Randall B. Weill
Michael S. Smith
**PRETI FLAHERTY, BELIVEAU**
**& PACHIOS LLP**
One City Center, P.O. Box 9546
Telephone: (207) 791-3000
ghansel@preti.com
rweill@preti.com
msmith@preti.com

Lee Albert
**GLANCY BINKOW & GOLDBERG LLP**
122 East 42nd Street, Suite 2920
New York, NY 10168
Telephone: (212) 682-5340
lalbert@glancylaw.com

W. Joseph Bruckner
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South
Minneapolis, MN 55401
Telephone: (612) 339-6900
wjbruckner@locklaw.com

Attorneys for Plaintiff Tiffin Motor Homes, Inc.

Melissa H. Maxman
Ronald F. Wick
**COZEN O'CONNOR**
1200 19th Street, NW
Washington, D.C. 20036
Tel: (202) 912-4800
mmaxman@cozen.com
rwick@cozen.com

Manuel J. Dominguez
**COHEN MILSTEIN SELLERS & TOLL PLLC**
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
Tel: (561) 833-6575
jdominguez@cohenmilstein.com

Solomon B. Cera
**CERA LLP**
595 Market Street, Suite 2300
San Francisco, CA 94105-2835
Tel: (415) 777-2230
scera@gbcslaw.com

Daniel R. Karon
**KARON LLC**
700 W. Clair Avenue, Suite 200
Cleveland, OH 44113
Tel: (216) 622-1851
dkaron@karonllc.com

Jason S. Hartley
**STUEVE SIEGEL HANSON, LLP**
500 West C Street, Suite 1750
San Diego, CA 92101
Tel: (619) 400-5822
hartley@stuevesiegal.com

Attorneys for Plaintiff SLTNTRST LLC, Trustee
for Fleetwood Liquidating Trust

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 12, 2016, I electronically filed the foregoing paper with the Clerk of the court using the ECF system which will send notification of such filing to all counsel of record registered for electronic filing.

FINK + ASSOCIATES LAW

By: /s/ Darryl Bressack
David H. Fink (P28235)
Darryl Bressack (P67820)
38500 Woodward Ave.; Suite350
Bloomfield Hills, MI 48304
Tel: (248) 971-2500
dbressack@finkandassociateslaw.com