REDACTED

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

|  |  |
|---|---|
| **IN RE AUTOMOTIVE PARTS ANTITRUST LITIGATION** | **CASE NO. 12-MD-02311**<br><br>**HON. MARIANNE O. BATTANI** |
| **In Re: AIR CONDITIONING SYSTEMS** |  |
| **THIS RELATES TO: DIRECT PURCHASER ACTIONS** | **2:13-cv-02701-MOB-MKM** |

## _CORRECTED_ SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs Tiffin Motor Homes, Inc., and SLTNTRST LLC, Trustee for Fleetwood Liquidating Trust, individually and on behalf of the proposed class of direct purchasers of Air Conditioning Systems (as defined below), bring this action against Defendants for damages under the antitrust laws of the United States.

## SUMMARY OF THE CASE

1.      Defendants are manufacturers of automotive air conditioning systems ("ACSs" or "Air Conditioning Systems"), including compressors, for installation in motor vehicles manufactured or sold in the United States.  Plaintiffs allege that Defendants conspired to rig bids, and to fix, maintain, and/or stabilize the prices of ACSs sold in the United States from at least as early as January 1, 2001 through the present.  Plaintiffs further allege that Defendants fraudulently concealed their conspiracy.

2.      On September 26, 2013, the United States Department of Justice ("DOJ") announced that Valeo Japan Co., Ltd. agreed to plead guilty and pay a $13.6 million criminal

REDACTED

fine for its role in a conspiracy to fix prices of ACSs installed in automobiles sold in the United States and elsewhere.

3.      On September 26, 2013, the DOJ announced that Mitsubishi Heavy Industries, Ltd. agreed to plead guilty and pay a $14.5 million criminal fine for its role in a conspiracy to fix prices of condensers and compressors installed in automobiles sold in the United States and elsewhere.

4.      On January 27, 2015, the DOJ announced that Sanden Corp. agreed to plead guilty and to pay a $3.2 million criminal fine for its role in a conspiracy to fix prices of compressors installed in automobiles manufactured and sold in the United States and elsewhere.

5.      Plaintiffs bring this lawsuit as a class action on behalf of direct purchasers who, during the Class Period, purchased ACSs in the United States from one or more of the Defendants.  This action is brought under Section 1 of the Sherman Act to enjoin Defendants' anticompetitive conduct and recover damages suffered by the Class.

6.      As a result of Defendants' unlawful conduct, Plaintiffs and members of the proposed Class paid higher prices for ACSs than they would have paid in a competitive market.

## JURISDICTION AND VENUE

7.      Plaintiffs bring this action to recover damages, including treble damages, and costs of suit and reasonable attorneys' fees, resulting from Defendants' violation of the Sherman Act, 15 U.S.C. § 1.

8.      The Court has jurisdiction over the subject matter of this action pursuant to Sections 4(a) and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.  Venue is proper in this district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c) and (d) because a substantial part of the events giving rise to

REDACTED

Plaintiffs' claims occurred in this District, affected interstate trade and commerce (discussed below) has been carried out in this District, and one or more of the Defendants reside in this District.

9.     By virtue of their nationwide contacts and activities, Defendants are subject to the jurisdiction of this Court.   Alternatively, there is jurisdiction over the foreign Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2).

**DEFINITIONS**

10.     The term "Class Period" refers to the time period from at least as early as January 1, 2001 through the present.

11.     The terms "ACSs" and "Air Conditioning Systems" refer to systems that cool the interior environment of a vehicle and are part of the thermal segment of the automotive market. Air Conditioning Systems, whether sold together or separately, are defined to include one or more of the following: automotive compressors, condensers, control panels, HVAC units (typically consisting of a blower motor, actuators, flaps, evaporator, heater core, and filter embedded in a plastic housing), sensors and associated hoses and pipes.

12.     The term "Defendant" or "Defendants" refers to the named Defendants and all of the named Defendants' predecessors, including ACS manufacturers merged with or acquired by the named Defendants, successors, and each named Defendant's wholly-owned or controlled subsidiaries or affiliates that sold ACSs directly to purchasers in the United States or to purchasers for use in the United States during the Class Period.

13.     References made herein to any corporation include any predecessors, successors, parents, subsidiaries, affiliates and divisions of that corporation.

REDACTED

## TRADE AND COMMERCE

14.     During the Class Period, each Defendant sold ACSs in the United States in a continuous and uninterrupted flow of interstate commerce.

15.     The business activities of the Defendants substantially affected interstate trade and commerce in the United States.

## PARTIES

16.     Plaintiff Tiffin Motor Homes, Inc., is an Alabama corporation with its principal place of business located in Red Bay, Alabama.  Tiffin Motor Homes, Inc. purchased ACSs directly from one or more Defendants during the Class Period and suffered injury as a result of Defendants' unlawful conduct.

17.     Plaintiff SLTNTRST LLC is the duly authorized and empowered Trustee for Fleetwood Liquidating Trust.  Fleetwood Liquidating Trust was formed pursuant to the Fourth Amended Joint Plan of Liquidation of Fleetwood Enterprises, Inc. and Its Affiliated Debtors and the Official Committee of Creditors Holding Unsecured Claims.  The Fourth Amended Joint Plan of Liquidation was confirmed by the United States Bankruptcy Court for the Central District of California (Riverside) pursuant to 11 U.S.C. § 1129.  Fleetwood Enterprises, Inc. filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code on March 10, 2009.  Fleetwood Enterprises, Inc., headquartered in California, was a leading producer of recreational vehicles, motor homes, and travel trailers in the United States.  Fleetwood Enterprises, Inc. purchased ACSs directly from one or more Defendants during the Class Period and suffered injury as a result of Defendants' unlawful conduct.

18.     Defendant Sanden Corp. is a Japanese corporation with its principal place of business in Tokyo, Japan.  Sanden Corp. – directly and/or through its subsidiaries, which it

REDACTED

wholly owned and/or controlled – manufactured, marketed, and/or sold ACSs that were purchased throughout the United States, including in this District, during the Class Period.

19.     Defendant Sanden Automotive Climate Systems Corporation is a Japanese corporation with its principal place of business in Tokyo, Japan.  Sanden Automotive Climate Systems Corporation manufactured, marketed, and/or sold ACSs that were purchased throughout the United States, including in this District, during the Class Period.

20.     Defendant Sanden Automotive Components Corporation is a Japanese corporation with its principal place of business in Tokyo, Japan.  Sanden Automotive Components Corporation manufactured, marketed, and/or sold ACSs that were purchased throughout the United States, including in this District, during the Class Period.

21.     Defendant Sanden International (U.S.A.), Inc. is a corporation with its principal place of business in Wylie, Texas.  It is/was a wholly-owned subsidiary of Sanden of America, Inc., which is/was a wholly-owned subsidiary of Sanden Corp.  Sanden International (U.S.A.), Inc. manufactured, marketed, and/or sold ACSs that were purchased throughout the United States, including in this District, during the Class Period.

22.     Defendants Sanden Corp., Sanden International (U.S.A.), Inc., Sanden Automotive Climate Systems Corporation, and Sanden Automotive Components Corporation are referred to collectively herein as "Sanden."

23.     Defendant Calsonic Kansei Corporation is a Japanese corporation with its principal place of business in Saitama, Japan.  Calsonic Kansei Corporation – directly and/or through its subsidiaries and other entities of which it is the ultimate parent, which it wholly-owned and/or controlled – manufactured, marketed, and/or sold ACSs that were purchased throughout the United States, including in this District, during the Class Period.

REDACTED

24.     Defendant CalsonicKansei North America, Inc. is a Delaware corporation with its principal place of business in Shelbyville, Tennessee.  It is a subsidiary of and wholly owned and/or controlled by its parent, Calsonic Kansei Corporation.  CalsonicKansei North America, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold ACSs that were purchased throughout the United States, including in this District, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales, and finances.

25.     Defendants Calsonic Kansei Corporation and CalsonicKansei North America, Inc., are referred to collectively herein as "Calsonic."

26.     Defendant MAHLE Behr GmbH & Co. KG ("MAHLE Behr") is a German corporation with its principal place of business in Stuttgart, Germany.  MAHLE Behr acquired Behr GmbH & Co. KG's Air Conditioning Systems business on or about 2010, and upon information and belief, MAHLE Behr assumed Behr GmbH & Co. KG's liabilities.  As a result of the acquisition, MAHLE Behr – directly and/or through its subsidiaries, which it wholly-owned and/or controlled – manufactured, marketed, and/or sold ACSs that were purchased throughout the United States, including in this District, during the Class Period.

27.     Defendant MAHLE Behr USA Inc. is a Delaware Corporation with its principal place of business in Troy, Michigan.  It is a subsidiary of and wholly owned and/or controlled by its parent corporation, MAHLE Behr.  MAHLE Behr USA Inc. – directly and/or through its subsidiaries, which it wholly-owned and/or controlled – manufactured, marketed, and/or sold ACSs that were purchased throughout the United States, including in this District, during the Class Period.

REDACTED

28.     Defendants MAHLE Behr and MAHLE Behr USA Inc. are referred to collectively herein as "Behr."

29.     Defendant Panasonic Corporation is a Japanese corporation with its principal place of business in Osaka, Japan.  Panasonic Corporation – directly or through its subsidiaries in the United States and elsewhere, which it wholly-owned and/or controlled – manufactured, marketed, and/or sold ACSs that were purchased throughout the United States, including in this District, during the Class Period.

30.     Defendant Panasonic Corporation of North America is a Delaware corporation with its principal place of business in Newark, New Jersey.  It is a subsidiary of and wholly-owned and/or controlled by its parent company, Panasonic Corporation.  Panasonic Corporation of North America manufactured, marketed, and/or sold ACSs that were purchased throughout the United States, including in this District, during the Class Period.   Specifically, Panasonic Automotive Systems Company of America, a registered assumed name of Panasonic Corporation of North America, is a division of Panasonic Corporation of North America and supplies automotive parts, including ACSs, to the North America automotive industry.   Panasonic Automotive Systems Company of America is headquartered in Peachtree City, Georgia, and has its main sales office in Farmington Hills, Michigan.  Panasonic Corporation of North America – directly or through its subsidiaries in the United States and elsewhere, which it wholly-owned and/or controlled – manufactured, marketed, and/or sold ACSs that were purchased throughout the United States, including in this District, during the Class Period.

31.     Defendants Panasonic Corporation and Panasonic Corporation of North America are referred to collectively herein as "Panasonic."

REDACTED

32.     Defendant Valeo Japan Co., Ltd. is a Japanese corporation with its principal place of business in Saitama, Japan. It is a subsidiary of and wholly controlled by Valeo S.A. Valeo Japan Co., Ltd. – directly and/or through its affiliates, which it wholly controlled – manufactured, marketed, and/or sold ACSs that were purchased throughout the United States, including in this District, during the Class Period.

33.     Defendant Valeo Inc. is a Delaware corporation with its principal place of business in Troy, Michigan. It is a subsidiary of and wholly owned and/or controlled by Valeo S.A. Valeo Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold ACSs that were purchased throughout the United States, including in this District, during the Class Period.

34.     Defendant Valeo Electrical Systems, Inc. is a Delaware corporation with its principal place of business in Troy, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, Valeo Inc. Valeo Electrical Systems, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold ACSs that were purchased throughout the United States, including in this District, during the Class Period.

35.     Defendant Valeo Climate Control Corp. is a Delaware corporation with its principal place of business in Bingham Farms, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, Valeo Electrical Systems, Inc. Valeo Climate Control Corp. manufactured, marketed, and/or sold ACSs that were purchased throughout the United States, including in this District, during the Class Period.

36.     Defendants Valeo Japan Co., Ltd., Valeo Inc., Valeo Electrical Systems, Inc., and Valeo Climate Control Corp. are referred to collectively as "Valeo."

REDACTED

37.     Defendant Mitsubishi Heavy Industries, Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan.  Defendant Mitsubishi Heavy Industries, Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold ACSs that were purchased throughout the United States, including in this District, during the Class Period.

38.     Defendant Mitsubishi Heavy Industries America, Inc. is a Delaware corporation with its principal place of business in New York, New York.  It is a subsidiary of and wholly owned and/or controlled by its parent, Mitsubishi Heavy Industries, Ltd.  Defendant Mitsubishi Heavy Industries America, Inc. manufactured, marketed, and/or sold ACSs that were purchased throughout the United States, including in this District, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales, and finances.

39.     Defendant Mitsubishi Heavy Industries Climate Control, Inc. is an Indiana corporation with its principal place of business in Franklin, Indiana.  It is a subsidiary of and wholly owned and/or controlled by its parent, Mitsubishi Heavy Industries, Ltd.  Defendant Mitsubishi Heavy Industries Climate Control, Inc. manufactured, marketed, and/or sold ACSs that were purchased throughout the United States, including in this District, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales, and finances.

40.     Defendants Mitsubishi Heavy Industries, Ltd., Mitsubishi Heavy Industries America, Inc., and Mitsubishi Heavy Industries Climate Control, Inc. are referred to collectively herein as "Mitsubishi."

REDACTED

41.     Defendant Denso Corporation is a Japanese corporation with its principal place of business in Kariya, Japan.   Defendant Denso Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold ACSs that were purchased throughout the United States, including in this District, during the Class Period.

42.     Defendant Denso International America, Inc. is a Delaware corporation with its principal place of business in Southfield, Michigan.   It is a subsidiary of and wholly owned and/or controlled by its parent, Denso Corporation.   Denso International America, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold ACSs that purchased throughout the United States, including in this District, during the Class Period.   At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales, and finances.

43.     Defendants Denso Corporation and Denso International America, Inc. are referred to collectively herein as "Denso."

**DEFENDANTS' CO-CONSPIRATORS AND AGENTS**

44.     The acts alleged in this Complaint to have been done by Defendants Sanden International (U.S.A.), Inc., CalsonicKansei North America, Inc., MAHLE Behr USA Inc., Panasonic Corporation of North America, Valeo Inc., Valeo Electrical Systems, Inc., Valeo Climate Control Corp., Mitsubishi Heavy Industries America, Inc., Mitsubishi Heavy Industries Climate Control, Inc., and Denso International America, Inc. were authorized, ordered, and condoned by their respective parent companies and the acts alleged to have been done by each were authorized, ordered, and performed by Defendants Sanden Corp., Sanden Automotive

REDACTED

Climate Systems Corporation, Sanden Automotive Climate Systems Corporation, Sanden Automotive Components Corporation, Calsonic Kansei Corporation, MAHLE Behr GmbH & Co. KG, Panasonic Corporation, Valeo Japan Co., Ltd., Mitsubishi Heavy Industries, Ltd., and Denso Corporation, and their officers, directors, agents, employees, or representatives while engaged in the management, direction, control, or transaction of their business affairs.

45. Various persons or firms not named as Defendants herein have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof. The Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this Complaint.

46. Each Defendant acted as the agent or joint venturer of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## CLASS ACTION ALLEGATIONS

47. Plaintiffs bring this action on behalf of themselves and all others similarly situated (the "Class") pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). The Class is defined as follows:

> All individuals and entities who or that purchased ACSs in the United States directly from one or more Defendants (or their controlled subsidiaries, affiliates, or joint ventures) from at least as early as January 1, 2001 through the present.

48. Plaintiffs do not know the exact number of Class members as such information is exclusively controlled by Defendants. Because of the trade and commerce involved, however, Plaintiffs believe that the Class is so numerous and geographically dispersed throughout the United States that joinder of all Class members is impracticable.

49. There are questions of law or fact common to the class, including but not limited to the following:

REDACTED

    a.    Whether Defendants engaged in a contract, combination, or conspiracy to rig bids and to fix, raise, maintain, and/or stabilize prices of ACSs sold in the United States;

    b.    Whether Defendants' conduct caused the prices of ACSs sold in the United States to be sold at artificially high levels;

    c.    Whether Defendants undertook actions to conceal their unlawful conspiracy; and

    d.    Whether Plaintiffs and other members of the Class were injured by Defendants' conduct, and, if so, the appropriate class-wide measure of damages for Class members.

50.    These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

51.    Plaintiffs' claims are typical of the claims of the Class because Plaintiffs directly purchased ACSs from one or more of the Defendants, all Class members were damaged by the same conspiracy alleged herein, and the relief sought by Plaintiffs is common to the Class.

52.    Plaintiffs will fairly and adequately represent the interests of the Class in that Plaintiffs are direct purchasers of ACSs and have no conflict with any other members of the Class.  Further, Plaintiffs have retained competent counsel experienced in antitrust, class action, and other complex litigation.

53.    A class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.  Prosecution of this matter as a class action will eliminate the possibility of repetitive litigation and there are no inherent barriers to managing the case as a class action.

REDACTED

54.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying outcomes.

55.     The Class is also readily definable and is one for which records likely exist in the files of Defendants and their co-conspirators.

## FACTUAL ALLEGATIONS

### Air Conditioning Systems

56.     Air Conditioning Systems are systems that cool the interior environment of a vehicle and are part of an automobile's thermal system.  Air Conditioning Systems, whether sold together or separately, include, among other things, one or more of the following: automotive compressors, condensers, control panels, HVAC units (typically consisting of a blower motor, actuators, flaps, evaporator, heater core, and filter embedded in a plastic housing), sensors, and associated hoses and pipes.

57.     The global automotive thermal industry is a $36 billion dollar a year industry. According to a leading industry publication, the U.S. market for automobile HVAC is approximately $12.5 billion.

58.     A compressor circulates highly pressurized refrigerant gas throughout the vehicle air conditioning system.

59.     A condenser cools the refrigerant gas by condensing it into liquid.

60.     HVAC refers to heating, ventilation, and air conditioning.  Automotive HVAC units help maintain good indoor air quality and regulate the interior temperature of a vehicle.

61.     Defendants and their co-conspirators manufacture and sell several types of ACSs.

62.     The Global Automotive HVAC Systems Market 2012-2016 report for the industry research firm TechNavio notes that Denso and Valeo are two key vendors that dominate the

REDACTED

Global Automotive HVAC Systems market. Denso is the largest North American producer of thermal systems, followed by Valeo. Based on its most recent annual report, Valeo earned approximately half a billion USD in 2012 in thermal system revenues, which includes Air Conditioning Systems revenues, from North America in 2012. Sanden, Calsonic, Behr, Panasonic, and Mitsubishi are all key players in the ACS industry.

63.     As part of the manufacturing process, original equipment manufacturers ("OEMs") install ACSs into new vehicles. They are also installed to replace worn out, defective or damaged parts.

64.     ACSs manufactured, distributed, or sold by Defendants and their co-conspirators during the Class Period are not functionally distinguishable in any material way.

65.     Plaintiffs and members of the proposed Class purchased ACSs directly from the Defendants.

**The Air Conditioning Systems Market is Conducive to Collusion**

66.     Several important economic characteristics of the market for ACSs made it conducive to a price-fixing conspiracy.

67.     One such important, economic characteristic of a market conducive to conspiratorial behavior is high barriers to entry. There are substantial barriers to entry in the market for ACSs because of significant start-up capital expenditures. A new entrant into the business would have to incur millions of dollars in costs, including large investments in plant and machinery, research and development, infrastructure for distribution, transportation, labor, and pre-existing customer relationships.

68.     The Defendants and their co-conspirators own multiple patents related to the manufacture of ACSs, which impose additional barriers to entry for new entrants into the ACS

REDACTED

business.  For example, Denso owns at least two patents, Valeo owns at least three patents, Mitsubishi owns at least one patent, and Sanden owns at least one patent, related to the manufacture of ACSs.  These existing patents held by Defendants and their co-conspirators would impose a significant and costly burden to new entrants, which must avoid infringing on the patents when entering the market with a new product.

69.   Additionally, the market for ACSs is highly concentrated.  Upon information and belief, Defendants and their co-conspirators control a majority of the market for the manufacture and sale of ACSs for use in motor vehicles manufactured and/or sold in or into the United States.

70.   Inelastic pricing is another important characteristic.  When a seller of goods or services can increase prices without suffering substantial reduction in sales, pricing is considered inelastic.  In order for a cartel to profit from raising prices above competitive levels, pricing must be relativity inelastic.  Otherwise, increased prices would result in declining use of the product, revenues, and profits.

71.   Pricing for ACSs is highly inelastic.  Motor vehicle manufacturers must use ACSs because there are no viable substitute products.

**Government Investigations and Guilty Pleas**

72.   On September 26, 2013, the DOJ charged Defendant Valeo Japan Co., Ltd. with participating in a "combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate the supply of, to rig bids for, and to fix, stabilize, and maintain the prices" of ACSs in violation of the Sherman Act.

73.   According to the Information filed, Defendant Valeo Japan Co., Ltd. and its co-conspirators carried out the Air Conditioning Systems conspiracy by:

(a) participating in meetings, conversations, and communications in the United

REDACTED

States and elsewhere to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(b) agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(c) agreeing, during those meetings, conversations, and communications, to allocate the supply of Air Conditioning Systems sold to automobile manufacturers, on a model-by-model basis, in the United States and elsewhere;

(d) agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

(e) submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

(f) selling Air Conditioning Systems to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices; and

(g) accepting payment for Air Conditioning Systems sold to automobile manufacturers in the United State and elsewhere at collusive and noncompetitive prices.

74.     Also on September 26, 2013, the DOJ announced that Defendant Valeo Japan Co., Ltd. had agreed to pay a $13.6 million criminal fine and plead guilty to a one-count criminal Information charging Valeo Japan Co., Ltd. with engaging in a conspiracy to rig bids for, and to

REDACTED

fix, stabilize, and maintain the prices of ACSs sold in the United States and elsewhere. On November 5, 2013, Valeo Japan Co., Ltd. pleaded guilty to this charge.

75. In a September 26, 2013 press release, Defendant Valeo Japan Co., Ltd. "acknowledge[d] its participation in certain anticompetitive practices in the market for air conditioning systems and components" and "commit[ted] to continue its cooperation with the DOJ with respect to the DOJ's on-going investigation concerning the same market."

76. On September 26, 2013, the DOJ charged Defendant Mitsubishi Heavy Industries, Ltd. with participating in a "combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the price" of compressors and condensers in violation of the Sherman Act.

77. According to the Information filed, Defendant Mitsubishi Heavy Industries, Ltd. and its co-conspirators carried out the Air Conditioning Systems conspiracy by:

(a) participating in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(b) agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(c) agreeing, during those meetings, conversations, and communications, to allocate the supply of compressors and condensers sold to automobile manufacturers in the United States and elsewhere;

(d) agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the

REDACTED

United States and elsewhere;

(e) submitting certain bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

(f) selling compressors and condensers to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g) accepting payment for compressors and condensers sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices; and

(h) engaging in meetings, conversations, and communications for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme.

78.    Also on September 26, 2013, the DOJ announced that Defendant Mitsubishi Heavy Industries, Ltd. had agreed to pay a $14.5 million criminal fine and plead guilty to a one-count criminal information charging Mitsubishi Heavy Industries, Ltd. with engaging in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of compressors and condensers sold in the United States and elsewhere.  On November 6, 2013, Mitsubishi Heavy Industries, Ltd. pleaded guilty to this charge.

79.    Eric Holder, U.S. Attorney General, stated in a September 26, 2013 DOJ press release that "[t]he Department of Justice will continue to crack down on cartel behavior that causes American consumers and businesses to pay higher prices for the products and services they rely upon in their everyday lives."

REDACTED

80.    On January 27, 2015, the DOJ announced that Sanden Corp. "agreed to plead guilty and to pay a $3.2 million criminal fine for its role in a conspiracy to suppress and eliminate competition for the purchase of compressors used in air conditioning systems sold to automobile manufacturer(s) for installation in vehicles manufactured and sold in the United States and elsewhere."

81.    According to the Information filed, Defendant Sanden Corp. and its co-conspirators carried out the compressors conspiracy by:

(a) engaging in communications in the Eastern District of Michigan and elsewhere to discuss the bids and price quotations to be submitted to automobile manufacturer(s) in the United States and elsewhere;

(b) meeting and agreeing to fix, stabilize, and maintain bid prices to be submitted to automobile manufacturer(s) in the United States and elsewhere;

(c) submitting bids and price quotations to automobile manufacturer(s) in the United States and elsewhere in accordance with the agreement reached;

(d) selling compressors to automobile manufacturer(s) in the United States and elsewhere at collusive and noncompetitive prices; and

(e) accepting payment for compressors sold to automobile manufacturer(s) in the United States and elsewhere at collusive and noncompetitive prices.

82.    The European Commission ("EC"), Competition Division, have also charged Defendants for their roles and participation in the global ACS conspiracy.

83.    On March 8, 2017, the EC announced criminal charges and fines imposed on Behr, Calsonic, Denso, Panasonic, Sanden, and Valeo, "for taking part in one or more of four

REDACTED

cartels concerning supplies of air conditioning and engine cooling components to car manufacturers in the European Economic Area (EEA)."

84.     The EC fines imposed on the six defendants totaled € 155 million.

## DEFENDANTS' ANTITRUST CONSPIRACY

85.     During the Class Period, Defendants and their co-conspirators, the dominant producers of ACSs, conspired to (a) rig bids for and allocate the supply of ACSs and (b) raise, fix, and maintain prices for ACSs sold in or into the United States.

86.     Defendants engaged in numerous acts in furtherance of the alleged conspiracy, as described below.

REDACTED

REDACTED

94.     Defendants knew and intended that their pricing actions regarding their sales of ACSs to motor vehicle manufacturers would have a direct impact on prices for ACSs sold to all direct purchasers throughout the United States.

95.     Defendants engaged in a single price-fixing conspiracy involving ACSs that impacted not only multiple bids submitted to OEMs, but also the prices paid by all other direct purchasers of ACSs.  Defendants' scheme was implemented, it succeeded, and it affected the prices for all ACSs.

96.     Defendants accomplished their conspiracy, in part, by rigging bids they made in response to RFQs.  OEMs issue RFQs to motor vehicle parts suppliers to obtain prices for parts, including ACSs.

97.     OEMs use RFQs to procure parts for U.S.-manufactured motor vehicles in the United States and abroad.

98.     Typically, OEMs issue RFQs for motor vehicle parts, such as ACSs, approximately three years before the OEM begins vehicle production.

99.     The RFQ process is designed to obtain independent bids from multiple suppliers. The OEM RFQ process generally works as follows: (a) the OEM issues the RFQ to multiple parts suppliers, (b) the suppliers submit bids, (c) depending on the OEM and product, the OEM and suppliers may revise the technical specifications and the pricing, (d) the suppliers submit revised bids, and (e) the OEM selects the winner.

100.     Generally, RFQ contracts are awarded to suppliers that submit the lowest bids and last for the life of a vehicle model (approximately five years).

101.     When an OEM purchases, for example, ACSs directly from the supplier to whom it awarded the contract, the OEM purchases the ACS at the winning price.

REDACTED

102.    That winning price is also used when suppliers that were not part of the RFQ process purchase ACSs directly from the winning ACS bidder for incorporation into products manufactured and sold to vehicle manufacturers.  Those suppliers, who directly purchase ACSs from the winning bidder, pay the winning bidder at least the winning price.

103.    It was important to the success of the cartel alleged herein that its members control and manipulate the prices paid by OEMs in order to control the prices paid by all other direct purchasers of ACSs.

104.    Direct purchasers of ACSs in addition to OEMs also paid supracompetitive prices as a result of Defendants' conspiracy because the price-fixed bid of the winning bidder established the floor at which all ACSs were sold to direct purchasers.

## PLAINTIFFS' CLAIMS ARE TIMELY

105.    Plaintiffs incorporate by reference the allegations set forth above and adopt same as though fully set forth herein.

106.    Plaintiffs and the members of the Class had no knowledge of the anticompetitive conduct alleged herein, or of facts sufficient to place them on notice of the claims set forth herein, until at least September 26, 2013, the date that the DOJ publically announced the guilty pleas of Defendants Valeo Japan Co., Ltd. and Mitsubishi Heavy Industries, Ltd., at the earliest. As a result, Plaintiffs and the members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until, at the earliest, September 26, 2013.

107.    No information in the public domain was available to Plaintiffs and the members of the Class prior to September 26, 2013, when the DOJ publically announced the guilty pleas of Defendants Valeo Japan Co., Ltd. and Mitsubishi Heavy Industries, Ltd.  Prior to that time, there

REDACTED

was insufficient information to suggest that any one of the Defendants and their co-conspirators was involved in a conspiracy to price-fix and rig bids for ACSs. For these reasons, the statute of limitations as to claims alleged herein did not begin to run until, at the earliest, September 26, 2013.

108.   Further, fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Class until at least September 26, 2013. Defendants affirmatively and wrongfully concealed their anticompetitive conduct from Plaintiffs and the Class, from at least as early as January 2001. During that time, Plaintiffs and the Class did not learn or discover the operative facts giving rise to the instant Complaint.

109.   Before at least September 26, 2013, Plaintiffs and members of the Class were unaware of Defendants' and their co-conspirators' unlawful conduct, and did not know before then that they were paying supra-competitive prices for ACSs throughout the United States during the Class Period. No information, actual or constructive, was ever made available to Plaintiffs and the members of the Class that would have suggested to Plaintiffs that they were being injured by Defendants' and their co-conspirators' unlawful conduct.

110.   The affirmative acts of the Defendants and their co-conspirators alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection. For example, the DOJ press release states that "[i]n order to keep their illegal conduct secret, [Defendants and their co-conspirators] used code names and met in remote locations."

111.   By its very nature, Defendants' and their co-conspirators' anticompetitive conspiracy was inherently self-concealing. ACSs are not exempt from antitrust regulation and,

REDACTED

thus, Plaintiffs and the members of the Class reasonably considered it to be a competitive industry.



116.    Plaintiffs and the members of the Class could not have discovered the alleged combination or conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their conduct.

117.    Plaintiffs received various pricing information from one or more of Defendants or their co-conspirators.  Plaintiffs had no way to know that these prices were higher than they should have been due to the conspiracy alleged herein.

118.    For these reasons, the statute of limitations applicable to Plaintiffs' and the Class's claims was tolled and did not begin to run until at least September 26, 2013.

REDACTED

## ANTITRUST INJURY

119.    Defendants' and their co-conspirators' conspiracy caused injury to Plaintiffs and members of the Class by suppressing price competition among ACS manufacturers, thereby depriving all direct purchasers of ACSs of the benefits of a competitive market and setting prices of ACSs at artificially high levels.

120.    As a direct result of Defendants' and their co-conspirators' conspiracy, Plaintiffs and members of the Class have been injured in their business or property in that they paid more for ACSs than they would have in a competitive market.

## CLAIM FOR RELIEF

### (Sherman Act Section 1 –Against All Defendants)

121.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

122.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, combination, or conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize prices for ACSs sold in or into the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

123.    The acts done by each of the Defendants and their co-conspirators as part of, and in furtherance of, the contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' and their co-conspirators' affairs.

124.    The contract, combination, or conspiracy resulted in an agreement, understanding, or concerted action between and among the Defendants and their co-conspirators in furtherance of which the Defendants and their co-conspirators fixed, raised, maintained, or stabilized prices

REDACTED

for ACSs sold in or into the United States. Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws.

125. Defendants and their co-conspirators succeeded in rigging bids and fixing, raising, maintaining, and stabilizing the prices of ACSs sold in or into the United States during the Class Period.

126. The conspiracy among Defendants and their co-conspirators consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.



f.     Selling ACSs to direct purchasers in the United States at supracompetitive prices; and

REDACTED

g.      Employing measures to conceal the true nature of their unlawful conduct from Plaintiffs and other members of the Class in furtherance of the conspiracy.

128.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the other members of the Class have been injured in their businesses and property in that they have paid more for ACSs than they otherwise would have paid in a competitive market.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf and on behalf of the Class herein, and respectfully request the following relief:

A.      That the Court determine that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, with Plaintiffs as the designated Class representative and their counsel as Class Counsel;

B.      That the contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this complaint, be adjudicated and decreed a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. §1;

C.      That Plaintiffs and members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against the Defendants in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. §15(a);

D.      That Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

REDACTED

     E.     That Plaintiffs and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

     F.     That Plaintiffs and members of the Class be awarded pre-judgment and post-judgment interest in accordance with law; and

     G.     That Plaintiffs and members of the Class receive such other or further relief as may be just and proper.

## <u>JURY TRIAL DEMANDED</u>

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

Dated:  May 23, 2018

/s/ David H. Fink
David H. Fink (P28235)
Darryl Bressack (P67820)
Nathan J. Fink (P75815)
**FINK + ASSOCIATES LAW**
38500 Woodward Ave; Suite 350
Bloomfield Hills, MI 48304
Telephone: (248) 971-2500
dfink@finkandassociateslaw.com
nfink@finkandassociateslaw.com

*Interim Liaison Counsel for the Direct Purchaser Plaintiffs*

Eugene A. Spector
William G. Caldes
Jonathan M. Jagher
Jeffrey L. Spector
**SPECTOR ROSEMAN & KODROFF, P.C.**
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone:(215) 496-0300
espector@srkattorneys.com
bcaldes@srkattorneys.com
jjagher@srkattorneys.com
jspector@srkattorneys.com

REDACTED

Steven A. Kanner
William H. London
Michael E. Moskovitz
**FREED KANNER LONDON & MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4510
skanner@fklmlaw.com
wlondon@fklmlaw.com
mmoskovitz@fklmlaw.com

Joseph C. Kohn
William E. Hoese
Douglas A. Abrahams
**KOHN, SWIFT & GRAF, P.C.**
1600 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 238-1700
jkohn@kohnswift.com
whoese@kohnswift.com
dabrahams@kohnswift.com

Gregory P. Hansel
Randall B. Weill
Michael S. Smith
**PRETI, FLAHERTY, BELIVEAU
& PACHIOS LLP**
One City Center, P.O. Box 9546
Telephone: (207) 791-3000
ghansel@preti.com
rweill@preti.com
msmith@preti.com

*Interim Lead Counsel for the Direct Purchaser
Plaintiffs*

Brian Murray
Lee Albert
Gregory B. Linkh
**GLANCY PRONGAY & MURRAY LLP**
230 Park Avenue; Suite 530
New York, NY 10169
Telephone: (212) 682-5340
bmurray@glancylaw.com
lalbert@glancylaw.com

REDACTED

Melissa H. Maxman
**COHEN & GRESSER LLP**
2001 Pennsylvania Ave., N.W., Suite 300
Washington, D.C. 20006
Telephone: (202) 851-2070
mmaxman@cohengresser.com

Manuel J. Dominguez
**COHEN MILSTEIN SELLERS & TOLL PLLC**
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
Telephone: (561) 833-6575
jdominguez@cohenmilstein.com

*Additional Counsel for the Direct Purchaser Plaintiffs*

REDACTED

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 23, 2018, I electronically filed the foregoing paper with the

Clerk of the court using the ECF system, which will send notification of such filing to all counsel

of record registered for electronic filing.

<div style="margin-left: 50%;">

FINK + ASSOCIATES LAW

By: /s/Nathan J. Fink
David H. Fink (P28235)
Darryl Bressack (P67820)
Nathan J. Fink (P75185)
38500 Woodward Ave; Suite 350
Bloomfield Hills, MI 48304
Telephone: (248) 971-2500
nfink@finkandassociateslaw.com

</div>